# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **KEVIN J. RHODES,**<br>    **Plaintiff** | **CIVIL ACTION** |
| **VERSUS** | **NO. 18-746** |
| **GENESIS MARINE, LLC**<br>**OF DELAWARE, ET AL.,**<br>    **Defendants** | **SECTION: "E" (2)** |

## ORDER AND REASONS

Before the Court is a motion for summary judgment filed by Defendant Genesis Marine, LLC of Delaware ("Genesis").[1] Plaintiff Kevin Rhodes opposes the motion.[2] Defendant Bollinger Shipyards, LLC ("Bollinger") also opposes the motion.[3] Genesis filed a reply.[4] For the reasons that follow, the motion for summary judgment is **DENIED**.

## BACKGROUND[5]

This is a maritime personal-injury case. Plaintiff Kevin Rhodes alleges he was injured on June 23, 2017 while working as a marine electrician for his employer, Complete Marine Services, LLP ("Complete Marine"), aboard the Genesis Barge 11103, which was owned by Defendant Genesis.[6] At the time of the alleged incident, the Genesis Barge 11103 was undergoing repairs performed by Defendant Bollinger at Bollinger's dry dock facility in Amelia, Louisiana.[7] As part of the repair work, Genesis contracted with Complete Marine to install electrical systems related to a new ballast water treatment system.[8]

---

[1] R. Doc. 43.
[2] R. Doc. 52.
[3] R. Doc. 51.
[4] R. Doc. 57.
[5] The facts herein are stated as alleged by Plaintiff. R. Doc. 1.
[6] R. Doc. 1. at ¶ III.
[7] *Id.*
[8] *Id.*

Because the ballast water treatment system was to be installed below the deck of the barge, to perform his work Plaintiff had to access the bilge and descend a ladder to access the lower level of the barge.[9]

"In order to access and descend the ladder, Plaintiff had to remove a grated opening to enter the bilge of the barge. The opening consisted of a cut-off piece of the grating."[10] To go through the opening, Plaintiff had to place the piece of grating that had been cut off (hereinafter the "hatch cover") on the deck near the hatch opening.[11] Plaintiff could then descend the ladder. Once he cleared the entrance, he had to replace the hatch cover back over the access hole.[12] On the date of the incident, as Plaintiff attempted to replace the hatch cover, "it got snagged on welding lead cables that were laid out across the walkway by employees of Defendant."[13] Plaintiff pushed himself back from the ladder to avoid being struck by the hatch cover.[14] Plaintiff fell off the ladder, sustaining various bodily injuries.[15] Plaintiff subsequently filed this lawsuit alleging negligence causes of action against Genesis and Bollinger.

Genesis has moved for summary judgment on the claims brought by Plaintiff against Genesis.[16] Genesis argues Plaintiff is entitled to recover from Genesis only if Plaintiff can prove Genesis breached at least one of the three duties Genesis owed Plaintiff as the vessel owner/operator under *Scindia Steam Nav. Co., Ltd. v. De Los Santos*[17]: (1) the turn over duty, (2) the active control duty, or (3) the duty to intervene.[18] Genesis

---

[9] *Id.*
[10] *Id.*
[11] *Id.*
[12] *Id.*
[13] *Id.*
[14] *Id.*
[15] *Id.*
[16] R. Doc. 43.
[17] 451 U.S. 156 (1981).
[18] R. Doc. 43-1 at 7.

argues there are no material facts in dispute and it is entitled to judgment as a matter of law that it did not breach any of these duties owed to Plaintiff.[19] Bollinger opposes this motion and argues Genesis is not entitled to summary judgment because there are material facts in dispute as to whether Genesis breached either or both of the first two *Scindia* duties owed to Plaintiff.[20] Plaintiff opposes this motion and argues Genesis is not entitled to summary judgment because there are material facts in dispute as to whether Genesis breached any, some, or all of three of the *Scindia* duties owed to Plaintiff.[21]

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[22] "An issue is material if its resolution could affect the outcome of the action."[23] When assessing whether a material factual dispute exists, the Court considers "all of the evidence in the record but refrain[s] from making credibility determinations or weighing the evidence."[24] All reasonable inferences are drawn in favor of the non-moving party.[25] There is no genuine issue of material fact if, even viewing the evidence in the light most favorable to the non-moving party, no reasonable trier of fact could find for the non-moving party, thus entitling the moving party to judgment as a matter of law.[26]

"[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of

---

[19] *See id.* at 7-13.
[20] R. Doc. 51.
[21] R. Doc. 52.
[22] FED. R. CIV. P. 56; *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).
[23] *DIRECTV, Inc. v. Robson*, 420 F.3d 532, 536 (5th Cir. 2005).
[24] *Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.*, 530 F.3d 395, 398–99 (5th Cir. 2008); *see also Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150–51 (2000).
[25] *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994).
[26] *Hibernia Nat. Bank v. Carner*, 997 F.2d 94, 98 (5th Cir. 1993) (citing *Amoco Prod. Co. v. Horwell Energy, Inc.*, 969 F.2d 146, 147–48 (5th Cir. 1992)).

[the record] which it believes demonstrate the absence of a genuine issue of material fact." To satisfy Rule 56's burden of production, the moving party must do one of two things: "the moving party may submit affirmative evidence that negates an essential element of the nonmoving party's claim" or "the moving party may demonstrate to the Court that the nonmoving party's evidence is insufficient to establish an essential element of the nonmoving party's claim." If the moving party fails to carry this burden, the motion must be denied. If the moving party successfully carries this burden, the burden of production then shifts to the non-moving party to direct the Court's attention to something in the pleadings or other evidence in the record setting forth specific facts sufficient to establish that a genuine issue of material fact does indeed exist.[27]

If the dispositive issue is one on which the non-moving party will bear the burden of persuasion at trial, the moving party may satisfy its burden of production by either (1) submitting affirmative evidence that negates an essential element of the non-movant's claim, or (2) affirmatively demonstrating that there is no evidence in the record to establish an essential element of the non-movant's claim.[28] If the movant fails to affirmatively show the absence of evidence in the record, its motion for summary judgment must be denied.[29] Thus, the non-moving party may defeat a motion for summary judgment by "calling the Court's attention to supporting evidence already in the record that was overlooked or ignored by the moving party."[30] "[U]nsubstantiated

---

[27] *Celotex*, 477 U.S. at 322–24.
[28] *Id.* at 331–32 (Brennan, J., dissenting).
[29] *See id.* at 332.
[30] *Id.* at 332–33. The burden would then shift back to the movant to demonstrate the inadequacy of the evidence relied upon by the non-movant. Once attacked, "the burden of production shifts to the nonmoving party, who must either (1) rehabilitate the evidence attacked in the moving party's papers, (2) produce additional evidence showing the existence of a genuine issue for trial as provided in Rule 56(e), or (3) submit an affidavit explaining why further discovery is necessary as provided in Rule 56(f)." *Id.* at 332–33, 333 n.3.

assertions are not competent summary judgment evidence. The party opposing summary judgment is required to identify specific evidence in the record and to articulate the precise manner in which that evidence supports his or her claim. 'Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment.'"[31] Rule 56 allows a party to move for summary judgment on all or part of a claim or defense.[32] Partial summary judgment serves the purpose of "rooting out, narrowing, and focusing the issues for trial."[33]

## LAW AND ANALYSIS

Generally, "the primary responsibility for the safety of the longshoremen rests upon the stevedore."[34] "Once stevedoring operations have begun, the owner has no duty to supervise or inspect the work and must only take care to prevent unreasonable hazards."[35] All parties agree[36] the United States Supreme Court's decision in *Scindia Steam Navigation Co. v. De Los Santos*, outlines the three narrow duties a vessel owner owes to a longshoreman once stevedoring operations commence: (1) the turnover duty; (2) the active control duty; and (3) the duty to intervene.[37]

### I.    Turnover Duty

The turnover duty establishes the owner's obligation at the start of the stevedore's activities. The turnover duty requires the owner to exercise "ordinary care under the

---

[31] *Ragas v. Tenn. Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998) (citing *Celotex*, 477 U.S. at 324; *Forsyth v. Barr*, 19 F.3d 1527, 1537 (5th Cir. 1994) and quoting *Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 915–16 & n.7 (5th Cir. 1992)).
[32] FED. R. CIV. P. 56.
[33] *See Calpetco 1981 v. Marshall Exploration, Inc.*, 989 F.2d 1408, 1415 (5th Cir. 1993).
[34] *Randolph v. Laeisz*, 896 F.2d 964, 970 (5th Cir. 1990).
[35] *Landry v. G.C. Constructors*, 514 F. App'x 432, 435 (5th Cir. 2013) (quoting *Levene v. Pintail Enters.*, 943 F.2d 528, 533 (5th Cir.1991)).
[36] R. Doc. 43-1 at 6-7; R. Doc. 51 at 3-4; R. Doc. 52 at ¶¶ 9-10.
[37] *See Howlett v. Birkdale Shipping Co., S.A.*, 512 U.S. 92, 98-99 (1994); *Scindia Steam Nav. Co. v. De Los Santos*, 451 U.S. 156, 166-79 (1981); *Kirksey v. Tonghai Mar.*, 535 F.3d 388, 391 (5th Cir. 2008).

circumstances to have the ship and its equipment in such condition that an expert and experienced stevedore will be able by the exercise of reasonable care to carry on its cargo operations with reasonable safety."[38] At the turnover point, the owner also must warn the stevedore of hidden dangers that could not be discovered by the exercise of ordinary care.[39] The owner thus has no obligation to warn the stevedore of dangers "which are either: (1) open and obvious or (2) dangers a reasonably competent stevedore should anticipate encountering."[40] However, the "open and obvious" exception does not apply if the stevedore's "only alternatives to facing the hazard are unduly impracticable or time-consuming or would force him to leave the job."[41]

Genesis argues "[P]laintiff provided no evidence of any kind whatsoever to establish the hatch cover was either a latent or hidden danger" and, although Plaintiff argues the hatch cover was defective because it was unhinged, Plaintiff "provided no evidence to demonstrate the cover needed a hinge or that without a hinge, it was a latent or hidden danger."[42] Genesis further argues the uncontested testimony confirms: "There was nothing unusual about the barge's ladder or hatch cover, and this accident would not have occurred had it not been for Bollinger's welding leads."[43] Genesis argues the fact nothing was "unusual" is undisputed because Plaintiff "admitted . . . that the hatch cover at issue was not unusual."[44] In support of its argument, Genesis cites to Plaintiff's deposition wherein Plaintiff testified:

Q: Nothing unusual about the grating?

---

[38] *Scindia*, 451 U.S. at 167.
[39] *Id.*; *Kirksey*, 535 F.3d at 392; *Levene*, 943 F.2d at 533; *Theriot v. Bay Drilling Corp.*, 783 F.2d 527, 535 (5th Cir.1986).
[40] *Kirksey*, 535 F.3d at 392.
[41] *Moore v. M/V ANGELA*, 353 F.3d 376, 381 (5th Cir. 2003) (citing *Scindia*, 451 U.S. at 167; *Pimental v. Ltd Canadian Pacific Bul*, 965 F.2d 13, 16 (5th Cir. 1992)).
[42] R. Doc. 57 at 1-2.
[43] R. Doc. 43-4 at 2.
[44] R. Doc. 43-1 at 10.

. . .

A: No, sir.[45]

Genesis cites as support for the fact that the accident "would not have occurred had it not been for Bollinger's welding leads" Plaintiff's deposition wherein Plaintiff testified, in relevant part:

Q: Okay. Well, was there anything else that it could have gotten caught on in that area?

. . .

A: Nothing to my knowledge behind me, no.

Q: Right. And nobody told you after the accident that they knocked the grating themselves?

A: No. No, nobody -- At the moment while I was going down, there was no one in my area at the time.

. . .

Q: . . . It wasn't a situation where you actually lost control of it and that's why it fell, right?

A: No, sir.

Q: I mean, this accident would not have occurred if it wasn't for those welding leads, right?

. . .

A: From what I see, yes, it wouldn't have occurred.[46]

It is Genesis's burden to provide affirmative evidence that negates the existence of any hidden danger. It is questionable whether this testimony is sufficient to do that.

---

[45] R. Doc. 43-2 at 182:24-183:9.
[46] R. Doc. 43-2 at 162:23-165:17.

In any event, Bollinger and Plaintiff do not agree it is an undisputed fact that there was no hidden danger.[47] Plaintiff argues the quoted testimony of the Plaintiff is not complete with respect to the unusual nature of the hatch cover. Plaintiff also testified: on other barges Plaintiff has worked on, hinged covers are easier to put back into place, barriers are placed around the access hole so the hatch cover is not repeatedly removed and replaced, and hatch covers are round, unlike the one at issue.[48] In support of his argument, Plaintiff also cites his deposition wherein: (1) Plaintiff agreed "a hatch cover is more easy to work if it's hinged" because "if it's hinged, it can just flop back into place"[49]; (2) Plaintiff testified that "normally on other vessels when you open up an access hole, Bollinger, as well, provides a barrier that you can put over the access hole and leave the cover off, and that way you don't you have to continually replace [it]"[50]; and (3) Plaintiff testified that on other barges Plaintiff "picked up ABS-approved covers off of hatch holes" that were "round."[51]

Genesis similarly argues that any hidden danger that existed was open and obvious to Plaintiff. Genesis argues the following fact is undisputed: "Bollinger's welding leads, which were strewn everywhere across the deck, and the unhinged hatch cover were both known to him prior to this accident such that these alleged dangers were open and obvious to him."[52] In support of its position, Genesis cites Plaintiff's deposition wherein Plaintiff testified:

Q: . . . [H]ow many welding leads were there actually spread out?"

---

[47] R. Doc. 51-2 at 2.
[48] R. Doc. 52-1 at 2.
[49] R. Doc. 52-3 at 125:13-25.
[50] *Id.* at 149:18-150:1.
[51] *Id.* at 178:14-21.
[52] R. Doc. 43-4 at 2.

A: Sir, I would be guessing. I can't say. It's a lot of hot work going on on both sides, so I can't tell you.

. . .

Q: But they were spread out everywhere in this area?

A: Correct. Correct.

Q: And I know you testified earlier that, you know, this work had been ongoing, but, I mean, you noticed these as soon as you walked into that room, right?

A: Correct.[53]

Genesis also cites as support Plaintiff's testimony that:

Q: Is it fair to say before this accident, right before you opened the grating cover and set it off to the side, you were aware that that grating wasn't hinged; is that right?

A: That's correct.

. . .

Q: So even at that moment just before your accident, you were aware that that hatch cover wasn't hinged?

A: That's correct.

Q: That was obvious to you?

A: That's correct.[54]

Bollinger and Plaintiff object to Genesis's characterization of Plaintiff's testimony.[55] Bollinger argues "Plaintiff never testified that 'Bollinger's welding leads (which) were strewn everywhere across the deck."[56] Plaintiff argues "[t]his statement of fact mischaracterizes Plaintiff's deposition testimony."[57] In support of his position,

---

[53] R. Doc. 43-2 at 160:10-161:18.
[54] *Id.* at 182:1-15.
[55] R. Doc. 51-2 at 2; R. Doc. 52-1 at 2.
[56] R. Doc. 51-2 at 2.
[57] R. Doc. 52-1 at 2.

Plaintiff cites his deposition, apparently to show he did not know the hatch cover was unhinged and the hidden dangers were not open and obvious to him, wherein he testified:

> Q: Okay. When you moved the cables or hoses away from the hatch, did you feel that after you moved them, they constituted a hazard?
>
> A: That is not my position. As far as if it's a hazard, that would be up to Bollinger. I can't guarantee it. It's not me to call that shot, sir. If they have hazardous leads out, it's not me to call that shot.[58]

Bollinger and Plaintiff respond that, even if the hazard was open and obvious, a genuine dispute of material fact exists as to the impracticability of Plaintiff having to avoid the hazard presented by the hatch cover.[59] Bollinger and Plaintiff argue that because there was no barrier around the hatch opening, Plaintiff had to remove and replace the piece of the grating whenever he descended down the ladder into the bilge and it would be impractical for him to avoid the hazard presented by the hatch cover.[60] In support of this position, Bollinger's opposition cites to its statement of uncontested material fact,[61] which in turn cites Plaintiff's testimony and Schenkenberg's testimony. Plaintiff testified:

> Q: Okay. But to enter that part of the compartment where you were working and if you were on the other side of that entrance, you would have to step over into the space, and then conceivably your next step could be right where the grating hatch is; is that correct?
>
> A: Correct.
>
> Q: And because of that, was it always necessary for you to, if you opened the hatch, that is removed the hatch cover, to reinstall or replace the hatch, so nobody who's walking in through that entrance would step into the hole?
>
> A: Correct.
>
> Q: Okay. So every time that you had to go down into that, to use that hatch to get to the bilge, you would first have to pick up the section of grating that was cut to size to fit the hatch opening, and what would you do with it?

---

[58] R. Doc. 52-3 at 143:12-19.
[59] R. Doc. 51 at 5-6; R. Doc. 52 at ¶¶ 13-14.
[60] *See id.*
[61] R. Doc. 51-2 at 6 (citing to 51-1 at p. 5).

A: I would have to place it to the side. Like pull it up with both hands, I would pull it up, put it down on the side, get on the ladder, and then pass my hand underneath like holding a pizza, and then maneuver it back on top of my head.[62]

. . .

Q: All right. On prior days, when you went through the hatch, when you had to enter the hatch and you had to remove the hatch cover, why did you always have to replace it?

A: Because when we first started it, we asked the foreman to let us put the barrier, and he told us no, we couldn't, because we were too close to the door access, as you can see, so he didn't want us to leave it off. He told us that we couldn't leave it off.[63]

Schenkenberg likewise testified:

Q: To get to the area where Mr. Rhodes was going is there any other way to get there?

A: No.[64]

. . .

Q: . . . From the balance water treatment system components that are in the bilge to the control panels, it was absolutely necessary for the CMS guys, that's Rhodes and this guy Chris Email to --

A: Um-hum

Q: -- work down below the grading deck in the bilge area, right?

A: Yes.[65]

The Court finds there are material facts in dispute with respect to whether Genesis violated the turn over duty and whether the open and obvious exception does not apply because safer alternatives were unduly impracticable or time consuming. The motion for summary judgment filed by Genesis is denied with respect to this issue.

---

[62] R. Doc. 51-3 at 94:7-95:14.
[63] *Id.* at 122:19-123:8.
[64] R. Doc. 51-5 at 42:2-3.
[65] *Id.* at 72:16-73:10.

## II.  Active Control Duty

A vessel owner may be liable under *Scindia's* active control duty if it actively involves itself in cargo operations or fails to protect contractors from hazards in areas under the active control of the vessel."[66] To determine whether a vessel owner retains active control, courts in the Fifth Circuit "generally consider 'whether the area in question is within the contractor's work area, whether the work area has been turned over to the contractor, and whether the vessel owner controls the methods and operative details of the stevedore's work.'"[67] Although not dispositive, the "complete absence" of vessel employees may be "evidence of . . . a lack of vessel control."[68]

The parties dispute whether Genesis controlled the methods and operative details of Plaintiff's work and, as a result, had active control over the area. Genesis argues the following fact is undisputed: "Genesis personnel, along with Genesis's 'company man' and project manager, Robert Schenkenberg, did not participate in either Bollinger's or Complete Marine's operations."[69] In support of this position, Genesis cites to the declaration of Robert Schenkenberg, Genesis's contracted project manager. Schenkenberg declared:

> Genesis crewmembers and I did not participate in Bollinger's or Compelete Marine's operations. In fact, Genesis's crewmembers had no involvement at all in their operations, nor did I as I was only the project manager tasked with reporting the progress of the Bollinger's and Complete Marine's work to Genesis. I did not see Genesis's crewmembers go near Bollinger's and Complete Marine's operations in the area of Rhodes's alleged accident, and they typically remained in the control room on the main deck of barge 11103 near midship."[70]

---

[66] *Fontenot v. McCalls Boat Rentals, Inc.*, 227 F. App'x 397, 403 (5th Cir. 2007).
[67] *Hudson v. Schlumberger Tech. Corp.*, 452 F. App'x 528, 535 (5th Cir. 2011) (quoting *Fontenot v. United States*, 89 F.3d 205, 208 (5th Cir. 1996)).
[68] *Manson Gulf, L.L.C v. Modern American Recycling Service, Inc.*, 878 F.3d 130, 135 (5th Cir. 2017) (citing *Fontenot*, 89 F.3d at 208; *Burchett v. Cargill, Inc.*, 48 F.3d 173, 179 (5th Cir. 1995)).
[69] R. Doc. 43-4.
[70] R. Doc. 43-3 at ¶ 5.

Bollinger and Plaintiff argue there is evidence that Genesis was in active control of the area.[71] In support of his position that Genesis was involved in the operations and, as a result, controlled the area, Plaintiff cites his deposition wherein he testified:

Q: Okay. And during those days, did you constantly try to keep aware of your surroundings, make sure there was no hazard on the floor or overhead or anything like that that could cause injury to you and/or Kris?

A: Right. Robert made it clear to us to keep our cables strapped up at the end of our day when we would leave, that everything needs to be out of the way.

Q: Okay. And during the day, if you saw a hazard, could you call Robert and say, "Look, we got to remedy this" or "fix this" or "move these welding cables," anything like that?

A: Robert I guess would be the one to do that.[72]

Plaintiff also cites the deposition of T.C. Hardee, Genesis's vessel manager, to show that Genesis Marine hired Robert Schenkenberg to serve as a project manager and oversee the operations taking place aboard the Genesis Barge 11103 and therefore "Genesis Marine maintained active control of the work being performed."[73] Hardee testified:

Q: Okay. And who was tasked with overseeing that project?

A: For Genesis?

Q: Correct.

A: Robert Schenkenberg.

Q: Okay. And it's your understanding that Robert Schenkenberg would oversee Genesis Marine's interest through this dry docking project, correct?

A: Correct.[74]

---

[71] R. Doc. 51-2 at 3; R. Doc. 52-1 at 2-3.
[72] R. Doc. 52-3 at 76:23-77:12.
[73] R. Doc. 52 at ¶¶ 18-19.
[74] R. Doc. 52-4 at 10:8-11:5.

Genesis also says its employees were not present at the time of the accident and as a result Genesis could not have been in control of the area. Genesis argues the following is undisputed: "Only Bollinger personnel were working in the area of plaintiff's accident, and, therefore, Bollinger (and not Genesis) had active control of the barge."[75] In support of its position, Genesis cites Plaintiff's deposition wherein Plaintiff testified:

Q: Okay. Did you ever complain to Robert about all these cables laying in these areas that you have shown?

A: I asked the foreman, the Bollinger foreman if we could have left the hatch off and put a barrier, because they do do have barriers in that yard they used in the past, and I asked him can we put a barrier there, and he said no, because we're too close to the access and it would bother the works going back and forth. And I can understand his argument, but, you know, we asked for the barrier to be put there.

Q: It's Genesis' vessel. Did you ever ask Genesis why there wasn't a barrier there?

A: I don't think Genesis had any control over any of the work. I can't guarantee that, but I don't know what Genesis' part was on that barge at the time.[76]

Plaintiff also testified:

Q: All right. Earlier, I think you testified Bollinger was in control of this area?

. . .

A: Bollinger had hot work going on, correct.

Q: Bollinger was the entity with the personnel that was completing the operations in the area with you, right?

. . .

A: That's correct.

Q: Were there any Genesis personnel working in this area?

A: I would see them at times come down there, but I'm not sure what they would have been doing, and then I would see them on top of the barge, as well. I'm not quite sure what Genesis was doing.

---

[75] R. Doc. 43-4 at 2.
[76] R. Doc. 43-2 at 104:23-105:15.

. . .

Q: Were there any Genesis personnel completing operations in this area?

. . .

A: In my area that we were working, no.

Q: And no one from Genesis was actually present when your accident occurred, right?

A: Not down there, no.[77]

It is Genesis's burden to submit affirmative evidence that negates that Genesis employees were in the work area, and as a result, that Genesis lacked control of the work area. The cited testimony does not accomplish that fact. Plaintiff's asking a Bollinger foreman, rather than Genesis personnel, about the barrier does not necessarily establish that Genesis had no employees present in the work area. Further, there is testimony that Plaintiff saw Genesis employees working in his work area from time to time.

Similarly, Genesis argues the following is undisputed: (1) "Genesis's crewmembers remained in the barge control room located on a completely different deck level and did not go near the area where Bollinger and plaintiff were working"; and (2) "[n]o Genesis personnel were present at the time of plaintiff's accident."[78] Genesis cites in support Plaintiff's deposition wherein he testified:

Q: And no one from Genesis was actually present when your accident occurred, right?

A: Not down there, no.[79]

---

[77] *Id.* at 183:10-184:22.
[78] R. Doc. 43-4 at 3.
[79] R. Doc. 43-2 at 44-45.

Plaintiff argues the statement by Genesis that no Genesis employees were present is "unsupported by evidence put forth by Genesis Marine."[80] Bollinger and Plaintiff state in their respective responses to Genesis's statement of uncontested material facts that they do not know whether Genesis personnel were present at the time of Plaintiff's incident.[81] Bollinger and Plaintiff argue that Genesis hired Schenkenberg to be its project manager on the barge and that Plaintiff's testimony establishes Schenkenberg was present in Plaintiff's work area throughout the course of the project.[82]

In its reply, Genesis argues it "did not have any employees working in the area of plaintiff's incident" because Schenkenberg "was not a Genesis employee" but rather "a project manager employed by, and received his paycheck directly from, Staton Marine Services, Inc."[83] Genesis attached to its reply the master service agreement[84] between Genesis and Staton Marine Services, Inc. ("Staton"), labeling Staton as an "independent contractor."[85] The status of Schenkenberg, and whether his presence amounted to the presence of Genesis, remains in dispute. Even assuming no Genesis employee was in the work area, this does not conclusively establish there is no genuine dispute of material fact as to whether Genesis breached its active control duty. The absence of vessel employees in a work area is not alone dispositive on this question.[86]

The Court finds that material facts are in dispute as to whether Genesis maintained active control of the area where Plaintiff's accident occurred. The motion for summary

---

[80] R. Doc. 52-1 at 3.
[81] R. Doc. 51-2 at 3; R. Doc. 51-2 at 3.
[82] R. Doc. 51 at 7-8; R. Doc. 52 at ¶¶ 18-19.
[83] R. Doc. 57 at 2-3.
[84] R. Doc. 57-3.
[85] *Id.* at 4.
[86] *See Fontenot*, 89 F.3d at 208.

judgment filed by Genesis is denied with respect to whether Genesis maintained active control of the area.

### III.    Duty to Intervene

The duty to intervene provides that a vessel owner may be liable if it fails to intervene when (1) it has actual knowledge of an unreasonably dangerous condition that has developed during the course of the stevedoring operations and (2) it knows that the stevedore, in the exercise of obviously improvident judgment, intends to continue working in the face of the danger and cannot be relied upon to protect its workers.[87] "There is a distinction between knowledge of a condition and knowledge of the dangerousness of that condition."[88] "Knowledge that a condition or even a defect exists, does not imply knowledge that the condition is dangerous."[89] A vessel owner is generally permitted to rely on the stevedore's expert judgment as to the safety of its working conditions[90] and "is entitled to rely on the stevedore's judgment that the condition, though dangerous, was safe enough."[91]

Genesis and Plaintiff[92] dispute whether Genesis had knowledge of the hazard presented by the hatch cover. Genesis argues the following facts are undisputed: "Plaintiff did not complain to anyone at Genesis about the welding leads and did not ask anyone at

---

[87] *Fontenot*, 227 F. App'x at 402-03; *see also Clay*, 74 F.Supp.2d at 673.
[88] *Id.*
[89] *Casaceli v. Martech Intern. Inc.*, 774 F.2d 1322, 1330 (5th Cir. 1985); *see Fontenot*, 227 F. App'x 397 at *6 (finding no duty to intervene when vessel owner did not know or believe that a trash bag blocking a walkway created an unreasonable risk of harm, regardless of whether vessel owner was aware of the obstruction); *Woods v. Sammisa Co.*, 837 F.2d 842, 853 (5th Cir. 1989) (finding no duty to intervene when vessel owners were aware that a condition existed but were unaware that the condition posed an unreasonable risk of harm); *Pledger v. Phil Guilbreau Offshore, Inc.*, 88 F. App'x 690, 692 (5th Cir. 2004) (finding no duty to intervene when neither stevedore nor shipowner thought the algae on the deck created an unreasonable risk of harm); *see also Futo v. Lykes Bros. Steamship Co.*, 742 F.2d 209 (5th Cir. 1984).
[90] *Greenwood v Societe Francaise De*, 111 F.3d 1239, 1249 (5th Cir. 1997).
[91] *Randolph*, 896 F.2d at 971 (citing *Helaire v. Mobil Oil Co.*, 709 F.2d 1031, 1039 n 12 (5th Cir. 1983); *Scindia*, 451 U.S. at 180).
[92] Bollinger only argues Genesis breached its first and second *Scindia* duties. R. Doc. 51.

Genesis for help in doing his job"[93] and "[n]either Genesis nor Robert Schenkenberg were ever made aware of the presence of any welding leads."[94] In support of its position, Genesis cites Plaintiff's deposition wherein Plaintiff testified:

Q: And no one from Genesis was actually present when your accident occurred, right?

A: Not down there, no.

. . .

Q: You couldn't see anybody else from Genesis in the area?

A: Not that I could see, no.

. . .

Q: All right. You don't have any knowledge about whether or not anyone at Genesis knew whether the welding leads were draped over the grating, do you?

A: I can't answer that, sir. I have no knowledge.

Q: You never complained to anybody at Genesis about the welding leads?

A: No.

Q: You never reported to anyone at Genesis that there were these welding leads that Bollinger left there?

. . .

A: I think Robert might have told them at times in my area.

Q: Did you ever tell anybody at Genesis that there were welding leads in the area?

A: I never did.

Q: All right. You said you think Robert knew that, right?

A: I seen Robert came down there and had discussions before with the Bollinger people about housekeeping.

---

Q: "Housekeeping." But you don't know whether or not Robert actually had knowledge that the welding leads were draped over the grating?

A: I would have to say he did, because he was down there the same day that I did get hurt and he could see it.

Q: Did he ever tell you that he knew that?

A: No. I'm just saying that—

Q: You're just saying you saw him in the area, so, therefore, you're assuming that he saw what he saw?

A: Correct. He's seeing what I'm seeing I'm sure.[95]

Plaintiff also testified:

Q: Okay. Do you know of any reason why he wouldn't be able to observe the hoses that we see in the photograph that your co-worker took?

A: No, I can't answer for him, but I mean, he's seeing the same thing I'm seeing.[96]

Genesis also cites as support the declaration of Schenkenberg. Schenkenberg declared:

I never observed Bollinger's welding leads before Rhodes's alleged accident, nor did anyone from Complete Marine or Bollinger report their presence to me. Genesis's crewmembers also did not report the presence of the welding leads, nor could they as they were not working in the area of Rhodes's alleged accident, which was not near the barge control room where they worked. Rhodes never asked my assistance in asking Bollinger to move the leads and never complained to me about the welding leads[.][97]

It is Genesis's burden to submit affirmative evidence that Genesis had no actual knowledge of an unreasonably dangerous condition. The cited testimony does not accomplish this goal. Instead, the cited testimony of Plaintiff indicates Genesis's project manager, Schenkenberg, may have been aware of the dangerous condition because Schenkenberg was present in the work area from time to time.

---

[95] R. Doc. 43-2 at 184:24-185:7; 185:18-188:1.
[96] *Id.* at 217:4-8.
[97] R. Doc. 43-3 at ¶ 7.

In any event, Plaintiff argues there are facts in dispute with respect to whether Genesis had a duty to intervene. Plaintiff argues Genesis and Schenkenberg were aware of the presence of the welding leads because "Schenkenberg, acting on behalf of Genesis Marine, would perform walk-arounds on the barge periodically throughout the day."[98] In support, Plaintiff cites his own testimony that Schenkenberg "did walk-arounds periodically throughout the day."[99] Plaintiff argues Genesis's knowledge of the condition may be inferred from the fact that Schenkenberg, Genesis's project manager, was aware of the hatch cover because he was in the work area periodically throughout the day and had "intervened to make sure the Complete Marine Services crew knew to properly store and put away their cables [and] [t]herefore, he should have known that the Bollinger crew would require the same direction and supervision."[100] In support, Plaintiff references his own deposition wherein he testified that Schenkenberg "did walk-arounds periodically throughout the day" and that in regards to the Complete Marine workers, "Robert made it clear to us to keep our cables strapped up at the end of our day when we would leave."[101]

The Court finds, Genesis has failed to meet its burden to show there is no genuine dispute as to any material fact as to whether there Genesis had actual knowledge of unreasonable dangers and, as a result, had a duty to intervene.

The motion for summary judgment filed by Genesis is denied with respect to whether Genesis had actual knowledge of the hazard.

---

[98] R. Doc. 52-1 at 3.
[99] R. Doc. 52-3 at 107:18-23.
[100] R. Doc. 52 at ¶ 21.
[101] R. Doc. 52-3 at 9-10, 18.

## CONCLUSION

For the foregoing reasons, **IT IS ORDERED** that the motion for summary judgment filed by Genesis[102] is **DENIED.**

**New Orleans, Louisiana, this 15th day of July, 2019.**

_____
**SUSIE MORGAN**
**UNITED STATES DISTRICT JUDGE**

---

[102] R. Doc. 43.